UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                        CRIMINAL NO. 08-295 (MJD/JSM)

      Plaintiff,

v.                                               REPORT AND RECOMMENDATION

KEENAN HARRIS (3), and
DELORES HOWARD (5),

      Defendants.


JANIE S. MAYERON, United States Magistrate Judge

The above matter came on for hearing before the undersigned upon defendant Keenan Harris's oral motion to suppress a traffic stop and citation from June 28, 2006; and on defendant Delores Howard's Motions to Suppress Evidence Obtained as a Result of Search and Seizure of Defendant's Residence and Vehicle [Docket No. 56], to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 57], and to Suppress Statements, Admissions and Answers [Docket No. 58]. Andrew R. Winter, Assistant United States Attorney, appeared on behalf of the United States of America; John L. Lucas, Esq. appeared on behalf of defendant Keenan Harris, who was personally present; and Gary R. Bryant-Wolf, Esq. appeared on behalf of defendant Delores Howard, who was personally present.  The matter was referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B).

Defendants are each charged with one count of conspiracy to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1),

841(b)(1)(A) and 846. Both defendants have brought motions to suppress evidence; however, because the motions to suppress stem from separate sets of facts, the Court will address each motion separately. Additionally, Howard has brought a motion to suppress statements.

Based upon the pleadings, the pre-hearing submissions, and testimony taken from Officer Mark Nelson and Special Agent Terry Glynn at the hearing on December 19, 2008, it is recommended that defendants' motions be denied.

## I.    HARRIS'S MOTION TO SUPPRESS

### A.    Facts

Officer Mark Nelson testified at the hearing to the following: on June 28, 2006, he was working for the St. Paul Police Department, and with his partner, effected a traffic stop shortly after 11:00 p.m. at White Bear Avenue and Fifth Street. Tr. 25. Officer Nelson had been driving in a marked patrol car northbound on White Bear Avenue. Tr. 25. He was approximately a half block behind a Jeep Cherokee also traveling northbound on White Bear Avenue in the curbside lane, when he observed it pull into a driveway at about XXX White Bear Avenue. Tr. 25. The vehicle's turn signal appeared as the vehicle was making the turn into the driveway; the driver did not signal the turn 100 feet prior to the turn, which is a violation of Minnesota Stat. § 169.19. Tr. 25, 40. As Officer Nelson drove past the vehicle, he observed it parked in the driveway such that it was blocking the entire sidewalk, which is a violation of a St. Paul city ordinance. Tr. 25-26, 35. Officer Nelson also observed that the driver did not exit the vehicle and was not doing anything, which Officer Nelson thought was suspicious, so he made a U-turn on White Bear Avenue, pulled behind the vehicle and activated his emergency

lights.  Tr. 25-26.  In Officer Nelson's experience, when a police car is travelling behind a vehicle and the driver makes a sudden turn into a driveway, stops short or parks at weird angles, it is suspicious because the driver may be trying to avoid police detection if they do not possess a valid drivers license, are impaired, or have narcotics or firearms in the vehicle.  Tr. 31-32.

Officer Nelson approached the vehicle and spoke with the driver, Keenan Harris. Tr. 26.  He asked Harris for his driver's license, and Harris provided him with a photo ID. Tr. 27.  Officer Nelson asked Harris whose car he was driving, and Harris stated that it was a rental car.  Tr. 27.  Officer Nelson asked Harris if he was on the rental agreement and Nelson said he was not.  Tr. 27.  Officer Nelson asked Harris who had rented the car, and Harris stated that Armando Sanders had rented the vehicle.  Tr. 27:3-8.  Officer Nelson did not write this statement about Sanders down in any notes or report.   Tr. 29-31, 35-37.[1]  At the time of the traffic stop, Officer Nelson was aware of an investigation into the activities of an alleged drug dealer named Armando Sanders.[2]  Tr. 30.

Because Harris did not have a valid driver's license, and had committed the traffic and ordinance violations, Officer Nelson issued him a citation.  Tr. 27.  Officer Nelson then had the vehicle towed to the city impound lot as no one else was in the car,

---

[1]      No notes, reports or tape-recordings were made of this stop.  Tr. 29.  The only paperwork generated from the stop were the citation issued to Harris and the tow sheet. Tr. 29.

[2]      Armando Sanders is a co-defendant in this case.

and Officer Nelson did not feel comfortable abandoning a rental vehicle in front of the residence.  Tr. 27.  Harris was not arrested.  Tr. 27-28, 43.[3]

As part of the impoundment of the car, an inventory search was performed, during which a rental agreement with Sanders' name on it, three cell phones and a charger were recovered.  Tr. 28, 30, 39.

On cross-examination, Officer Nelson testified that he did not know the exact wording of the policy of the St. Paul Police Department on towing vehicles, but he knew that he was not in violation of the policy.  Tr. 38-39.   Officer Nelson stated that the reason an inventory search is performed prior to the tow, rather than at the police station, is to ensure that anything of value inside the vehicle is documented before it is turned over to the tow truck driver in case a theft occurs at a later time.  Tr. 39.

**B.   Analysis**

Harris has moved to exclude the rental agreement seized from the vehicle and the statement he made to Officer Nelson that Sanders had rented the car.  Harris Post-Hearing Memorandum ("Harris Mem.") pp. 1-2, 9-10 [Docket No. 93].[4]  Harris argued that Officer Nelson did not have reasonable suspicion to stop Harris in the vehicle and that the inventory search of Harris' vehicle was unconstitutional.  Harris Mem., pp. 3-9.

---

[3]     Officer Nelson believed that the driveway was in front of a private residence; however, he did not investigate whether the homeowner did or did not know Harris.  Tr. 37-38.

[4]     At the hearing, Harris indicated that he was moving to suppress any information that was derived from the stop, including his identity as the driver of the vehicle, the information that Sanders was the renter of the vehicle, any statements made by Harris during the stop, and anything that was observed inside the vehicle.  Tr. 41.  However, as Harris has confined his arguments in his post-hearing brief to the seizure of the rental agreement and his statement regarding Sanders as the renter of the car, the Court has confined its analysis to these two topics.

Additionally, Harris contended that Officer Nelson's testimony regarding statements made by Harris during the stop should be suppressed as violative of Rule 16 of the Federal Rules of Criminal Procedure and his rights under the Fifth and Sixth Amendments. Id., pp. 9-10.

### 1.    Motion to Suppress Rental Agreement

#### a.    Stop of Vehicle

Officer Nelson testified that the vehicle did not signal its turn within 100 feet of making the turn, and then parked in a driveway blocking the sidewalk.  Nevertheless, Harris argued:

> From the officers' position traveling northbound, they would not have had the opportunity to determine whether Mr. Harris signaled in time before making the turn, because there were many cars traveling toward the squad car, in the opposite direction of Mr. Harris.  These vehicles blocked the officers' line of sight and prevented them from establishing reasonable suspicion that Mr. Harris failed to signal within 100 feet of making the turn.

Harris Mem., p. 4.   Additionally, Harris claimed that the officers lacked reasonable suspicion to believe that Harris' car was blocking the sidewalk at XXX White Bear Avenue because he had merely pulled into the driveway, rather than parked the car, and the purpose of the ordinance, the safety of pedestrians, was not compromised because there were no pedestrians on the street. Id.  Neither argument finds support in the law or the record.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  "It is well established that a roadside traffic stop is a 'seizure' within the meaning of the Fourth Amendment." United States v. Jones, 269 F.3d. 919, 924 (8th Cir. 2001).  However, "a traffic violation – however minor – creates probable

cause to stop the driver of a vehicle." United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002) (citations omitted). This is true even if a valid traffic stop is a pretext for another investigation. Id. (citation omitted).

Here, Officer Nelson testified that the vehicle did not signal its turn within 100 feet of making the turn, a violation of Minn. Stat. § 169.19, and then parked it blocking the sidewalk, a violation of St. Paul City Ordinance § 157.15(1). As such, the traffic stop of the vehicle was constitutionally valid.

Harris's contention that the officers had no opportunity to determine whether he had signaled in time mischaracterized the evidence in the record. Officer Nelson testified as follows:

> We were on patrol northbound White Bear at about – just north of Third. We were in a marked patrol car. I saw in the curbside lane there was a Jeep Cherokee, also northbound White Bear from about Third. I saw this particular vehicle pull into a driveway at about XXX White Bear. When the vehicle made that turn into the driveway, we were about a half block behind it. And I saw that the vehicle, as it was turning into the driveway signal its turn, which is a violation of a Minnesota Statute 169.19, fail to signal 100 feet prior to turn. I observed the vehicle, as I drove by, park, blocking the entire sidewalk. And then I, in my rearview mirror and my partner was watching, too, saw that the driver of the vehicle didn't exit, wasn't doing anything.

Tr. 25.

Officer Nelson was a half block behind Harris' vehicle, in the same lane as Harris, when Harris made the illegal turn into the driveway. There was no testimony that the officers had any trouble seeing Harris' vehicle when it made the turn, or that there were any vehicles traveling in the opposite direction of the cars driven by Officer Nelson and Harris, much less that such traffic obscured Officer Nelson's sight of Harris' car.

Further, Harris' argument that the officers lacked reasonable suspicion to believe that Harris' car was violating a city ordinance is meritless.  First, the Court has already found that the officers had adequate reasonable suspicion based on the illegal turn to stop Harris, and therefore whether the officers had additional reasonable suspicion based on the city ordinance violation is inconsequential.  Second, St. Paul City Ordinance § 157.15(1) clearly states that  "[n]o person shall <u>stop</u>, <u>park</u> or drive an automobile…along or across any public curb, boulevard or <u>sidewalk</u> within the limits of the City of Saint Paul, other than where regular or authorized driveways or crossing are provided for that purpose..." (emphasis added).   The ordinance clearly prohibits both parking and stopping across a sidewalk; that Harris was blocking the sidewalk because he had pulled into the driveway is irrelevant.  Harris' further contention that the purpose of the ordinance – the safety of pedestrians – was not compromised because there were no pedestrians, is even less compelling.  The ordinance does not require that pedestrians be present – it only requires that a vehicle be stopped or parked across the sidewalk.

The Court finds that the stop of Harris' vehicle was constitutionally valid.

b.   <u>Inventory Search</u>

Harris also contended that the inventory search of his vehicle violated his Fourth Amendment rights because it was not performed pursuant to standardized police procedures.[5]   Harris Mem., p. 6.   Specifically, Harris argued that the police must

---

[5]      The Court questions whether Harris, as neither the owner nor the renter of the vehicle, has standing to contest the inventory search of the vehicle.  <u>See</u> <u>i.e.</u> <u>United States v. Edwards</u>, 242 F.3d 928, 936 (10th Cir. 2001) (defendant did not have standing to challenge the search of the car itself because it was rented in a third party's name and he was not an authorized driver of the vehicle); <u>United States v. Boruff</u>, 909 F.2d

conduct warrantless inventory searches pursuant to standardized police procedures, and if law enforcement have no standardized policy for conducting such a search, then evidence discovered during the search should be suppressed. Id.  In support of this position, Harris argued that where, as here, Officer Nelson was ignorant of the St. Paul Police Department's standard inventory procedures, the inventory search was conducted at the scene rather than at the impound location and without the aid of an evidence technician, the officers omitted the rental agreement and any other items of personal property found in the vehicle when they completed the tow report, and other arrangements could have been made to remove the vehicle from the driveway, the search was invalid and should be suppressed.  Harris Mem., pp. 7-8.

A warrantless inventory search does not necessarily violate the Fourth Amendment.  See South Dakota v. Opperman, 428 U.S. 364, 369 (1976); United States v. Marshall, 986 F.2d 1171, 1173 (8th Cir. 1993).  Thus, "[p]olice may conduct a warrantless search of a lawfully-impounded vehicle even in the absence of probable cause."  United States v. Kennedy, 427 F.3d 1136, 1143-44 (8th Cir. 2005) (citing Florida v. Wells, 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990); United States v. Petty, 367 F.3d 1009, 1011-12 (8th Cir. 2004)).  In performing an inventory search which does not violate the Fourth Amendment, the Eighth Circuit has articulated the following principles:

> [O]fficers need neither search warrant nor probable cause, for they are not investigating a crime; instead, they are "performing an administrative or care-taking function." Marshall, 986 F.2d at 1174 (explaining Opperman). In performing this function, officers may legitimately be protecting the

---

111, 117 (5th Cir. 1990) (holding an individual who was not listed as a driver on the rental agreement did not have a legitimate expectation of privacy despite the fact that he was in "sole possession and control of the vehicle" at the time of the stop).

owner's property while it remains in custody. <u>Opperman</u>, 428 U.S. at 369, 96 S.Ct. 3092. They may be protecting themselves from claims of lost or damaged property or from any potential danger posed by the unknown contents of the vehicle. <u>Id.</u> The only limit on such searches is they must be reasonable under the circumstances. <u>Id.</u> Inventory searches are reasonable if "conducted according to standardized police procedures, which vitiate concerns of an investigatory motive or excessive discretion." <u>Id.</u>

<u>United States v. Rowland</u>, 341 F.3d 774, 779 (8th Cir. 2003).

At the end of the day, "[t]he central question in evaluating the propriety of an inventory search is whether, in the totality of the circumstances, the search was reasonable." <u>Kennedy</u>, 427 F.3d at 1144 (citing <u>United States v. Rankin</u>, 261 F.3d 735, 740 (8th Cir. 2001)).

As a preliminary matter, the Court does not find that the inventory search here was performed in violation of any policies of the St. Paul Police Department.  Officer Nelson testified that "[w]e always inventory a search before it's turned over to the tow truck driver so we can insure anything of value in the vehicle is documented. So if a theft occurs at a later time, it's documented what was in the car ahead of time."  Tr. 39. No evidence was submitted to the contrary; in fact, no other evidence was submitted to the Court regarding police department impound policies.

Further, no evidence was presented to suggest that there was a requirement that an evidence technician be present to perform a vehicle inventory search pursuant to a traffic stop.  Finally, Officer Nelson testified that he could not recall any items of value in the vehicle other than the three cell phones and charger which were listed on the inventory report.

There is simply nothing in the record to suggest that the officers violated any policy or procedure, particularly when no one provided the Court with any relevant policy or procedure against which to evaluate the actions of the officers.[6]

Harris' reliance on United States v. Rowland, where a warrantless inventory search of a vehicle was rejected when officers made a record of only potentially incriminating evidence, rather than all of the evidence in the vehicle, is misplaced. 341 F.3d 774, 779 (8th Cir. 2003). In Rowland, the Eighth Circuit compared the officers' actions with a county's towing and impound policy, which was in the record, and found that "by failing to make a record of all property within the vehicle [as required by the policy], law enforcement failed to follow its own procedures." Id. at 780. While that finding alone or the fact that the officers had an investigatory motive did "not mandate the suppression of the evidence discovered as a result of the search," the court went on to find in that case that "law enforcement's failure to record property does illustrate that

---

[6]    The Court notes that in United States v. Garner, the Eighth Circuit described St. Paul's impound policy as follows:

> St. Paul Department Policy No. 445.151 states that prior to towing any vehicle, officers shall conduct an inventory search of the vehicle in order to "(1) protect the vehicle owner's property; (2) protect the Department and City against disputes over lost or stolen property; and (3) protect the officers and other employees from dangerous instrumentalities." Id. The policy also provides that the impoundment must be lawful and not a pretext to search a vehicle where other grounds to search are lacking.

181 F.3d 988, 990 (8th Cir. 1999). Regarding the manner of conducting an inventory search, the court stated "Policy 445.151 only states that an inventory search shall be conducted prior to towing to the impoundment lot and that officers are permitted to search inside any container discovered if the officers are unable to ascertain its contents by examining its exterior. See Policy 445.151." Id., at 992. Although the Court does not have the benefit of St. Paul's current impound policy, and does not know if it is the same or has changed since Garner, if, indeed, it is the same as described in Garner, then there is nothing before this Court to indicate that the officers here did not comply with St. Paul impound procedures.

the inventory search was pretextual." Id. at 780-81.  The court summarized its analysis

as follows:

> In sum, law enforcement had standardized procedures in place but failed
> to follow them here. Such failure, coupled with the fact the officers
> disregarded items without evidentiary value, even though they were of
> questionable monetary value, suggests they did not search the vehicle in
> order to safeguard the vehicle's contents from loss, or to protect law
> enforcement personnel from harm, or even to guard the department and
> county against a possible lawsuit. Rather, it appears law enforcement
> sifted through the vehicle's contents searching only for and recording only
> incriminating evidence; something law enforcement may not do.

Id. at 782 (citations omitted).

In contrast, in this case the Court does not know whether the officers did or did

not comply with any written inventory policies because as previously stated, no written

policies were offered into evidence.  Rather, like Garner, when the defendant similarly

argued that the arresting officers' failure to provide a full inventory of a vehicle's

contents demonstrated "the pretextual nature of the search and renders it invalid," the

court held that "[s]ince neither the city policy nor the police procedures required the

officers to record all items recovered during the inventory search on a specific form or in

a particular fashion, the officers' failure to draft an inventory list does not prove…they

acted in bad faith."  181 F.3d at 992.  In this case, there is nothing before this Court to

indicate that the officers did not comply with policies for memorializing what was

confiscated as part of an inventory search.[7]

As to Harris' argument that the impoundment of the vehicle was not necessary

because the officers could have allowed him to make other arrangements to remove the

---

[7]    In any event, there is nothing in the record to suggest that the officers failed to
record other property that was in the vehicle, aside from the rental agreement, which
arguably could not even be considered to be "property."

vehicle from the driveway, Harris contended that Minnesota state law strongly discourages the impoundment of vehicles when alternative arrangements are available. See Harris Mem., p. 7 (citing to State v. Goodrich, 256 N.W.2d 506, 511 (Minn. 1977)). In Goodrich, the court found that where the defendant did not ask to simply leave his locked automobile on the street but arranged to have his mother or brother drive it home, the assumption of custody by the police gave rise to an invasion of defendant's privacy protected by the Fourth Amendment. Id. at 511. The court then held that "[t]he state has not shown that the impoundment was a reasonable means of furthering a reasonable state purpose." Id.

No evidence was presented to suggest that alternative arrangements were actually available in this case, or that Harris offered to make any such arrangements. Officer Nelson testified that he was not comfortable leaving a rental car abandoned in front of the house, and impounding the vehicle would allow the rental company to get the vehicle back. Tr. 43. The Court finds no flaw in this logic. Officer Nelson knew that Harris was not the owner or renter of the vehicle, and that Harris could not drive the vehicle because he did not posses a valid driver's license. As such, the police were not required to allow Harris to make alternative arrangements and were permitted to impound it to ensure its return to the rental company. See United States v. Little, 945 F.Supp. 79, 84 (S.D.N.Y. 1996) ("[A]s far as the officers knew, and pursuant to the terms of the car rental agreement, no occupant of the vehicle was authorized to drive it. As a result, the officers had the right to impound the car in order to return it to the car rental company.").

Lastly, even if this Court did find that the officers did not comply with inventorying procedures, suppression is not necessarily required. "Even when law enforcement fails to conduct a search according to standardized procedures, this does not mandate the suppression of the evidence discovered as a result of the search." Rowland, 341 F.3d at 780 (citing United States v. Mayfield, 161 F.3d 1143, 1145 (8th Cir. 1998)). "There must be something else; something to suggest the police raised "the inventory-search banner in an after-the-fact attempt to justify" a simple investigatory search for incriminating evidence." Id. (citing Marshall, 986 F.2d at 1175). In this case, there is nothing in the record to suggest that an inventory search of the vehicle was performed for any reason other than to secure and protect property found in it.

For all of these reasons, and based on the totality of the circumstances, the Court finds that the impoundment and inventory search of the vehicle were reasonable, and therefore, recommends that Harris' motion to suppress the rental agreement on this basis be denied.

### 2. Motion to Suppress Statement

Harris maintained that because the Government failed to notify him that it planned to introduce the self-incriminating statement that Armando Sanders rented the car he was driving on June 28, 2006, this statement should be suppressed. Harris Mem., p. 9. According to Harris, the introduction of the statement was a violation of Fed. R. Crim. P. 16 and deprived him of his due process right to a fair trial as well as his Sixth Amendment right to confront witnesses against him. Id.

In response, the Government conceded that it did not disclose the statement about Sanders prior to the suppression hearing, but stated that it was unaware of the

existence of the statement until the hearing.  Government's Memorandum in Response to Motions to Suppress ("Gov't Mem."), p. 6 n. 2 [Docket No. 105].[8]  The Government contended that Rule 16 is inapplicable because it only applies to written statements, and Officer Nelson testified that he never wrote a report regarding the statement.  Id., pp. 6-7.  The Government further argued that the statement was made during a routine traffic stop and as such did not constitute interrogation.  Id., p. 7.  Finally, the Government asserted that even if this Court were to find that disclosure was mandated by Rule 16, suppression of the statement was not required.  Id., pp. 7-8.

In pertinent part, Fed. R. Crim. P. 16(a)(1) states:

(A) Defendant's Oral Statement.  Upon a defendant's request, the government must disclose to the defendant the substance of any relevant oral statement made by the defendant, before or after arrest, in response to interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial.

(B) Defendant's Written or Recorded Statement.  Upon a defendant's request, the government must disclose to the defendant, and make available for inspection, copying, or photographing, all of the following:
(i) any relevant written or recorded statement by the defendant if:
• the statement is within the government's possession, custody, or control; and
• the attorney for the government knows--or through due diligence could know--that the statement exists;
(ii) the portion of any written record containing the substance of any relevant oral statement made before or after arrest if the defendant made the statement in response to interrogation by a person the defendant knew was a government agent; and
(iii) the defendant's recorded testimony before a grand jury relating to the charged offense.

---

[8]    The Government does not contend that Harris did not request disclosure of any statements by him, and the Court finds that Harris did make such a request.  See Defendant's Motion for Discovery, ¶1 [Docket No. 30].  Further, the Government stated in response to Harris' motion that it "has complied with Rule 16 and will continue to comply."  Government's Omnibus Answer to Defendants' Pretrial Motions.  [Docket No. 77].

Rule 16(a)(1)(B) is inapplicable because there is no written record of the statement.  Rule 16(a)(1)(A) only comes into play if the statement was made in response to an interrogation by a government agent.  Thus, the initial question this Court must answer is whether Officer Nelson's questions to Harris regarding the identity of the renter of the car amounts to an "interrogation" under Fed. R. Crim. P. 16(a)(1)(A).

The Government cites to United States v. Howard, 532 F.3d 755, 761 (8th Cir. 2008), for the proposition that roadside questioning does not constitute interrogation. However, Howard is of no assistance as it did not address Rule 16.  Rather, Howard stood for the proposition that the roadside questioning of the defendant did not constitute a custodial interrogation requiring Miranda warnings.  Id. at 761.  The Government also cited to United States v. Reeves, 730 F. 3d 1189, 1193 (8th Cir. 1983).  There, one of the defendants, Branscum, spoke with the officers transporting him to jail after his arrest, and allegedly said, "I know I am in trouble. I know I need help."  Id. at 1192.  The statement was admitted at trial, even though the Government had not disclosed it to defendants in advance of trial.  On appeal from their conviction, defendants maintained that the district court erred in allowing the government to offer Branscum's "I know I am in trouble" statement at trial because it had not been disclosed pursuant to Rule 16(a).  Id. at 1193.  The Eighth Circuit found that Branscum's statement was an oral statement but it was not made in response to interrogation, and therefore, was not discoverable under Rule 16(a).  Id. (citing United States v. Johnson, 562 F.2d 515, 518 (8th Cir.1977) (per curiam)).  In Johnson, an undercover agent identified himself by a street name to the defendant at the time of his arrest, and said, based on an earlier encounter with defendant, "You remember I was, you know, with

White Folks," to which the defendant answered, "Yeah."   562 F.2d at 517.   The government did not disclose to defendant this conversation statement prior to trial, yet it was permitted to elicit it from the officer on re-direct after the defendant had attempted to discredit the officer's identification of him on cross-examination.   Id.   The defendant moved to suppress the conversation because the government had represented that it knew of no statements made by defendant at the time of his arrest and did not intend to offer any such statements, and because the government had failed to disclose the statement pursuant to Fed. R. Crim. P. 16.   Id. at 518.   In denying the motion, the court found that there was no indication that the government made a deliberate misrepresentation when it stated that it did not know of any statements made by the defendant at the time of his arrest, and that the defendant's failure to offer any reason for suppression of the statement showed no prejudice.   Id. at 518.   The court further found that no interrogation had taken place, and that the undercover agent was not known to the defendant as a government agent.   Id.

Here, unlike in Reeves and Johnson, Harris was asked several questions by Officer Nelson to identify the renter of the vehicle, and Harris was aware that Officer Nelson was a police officer.   The Court finds that the questioning amounted to an interrogation, and Harris's statements in response should have been timely disclosed by the Government pursuant to Fed. R. Crim. P. 16.[9]

---

[9]   The Court observes that Fed. R. Crim. P. 16 does not specifically speak to a custodial interrogation by a government agent, as is required for an analysis of the provision of a Miranda warning.   However, a number of courts have imported the definition of a custodial interrogation, as enunciated in Rhode Island v. Innis, 446 U.S. 291, 301-02 (1980), in determining whether an interrogation has taken place for the purpose of a Rule 16(a) disclosure.   See e.g. Smith v. United States, 285 Fed.Appx. 209, 214 (6th Cir. 2008), and cases cited therein.   In Innis, the Supreme Court was

Despite having found that Harris' statement regarding Sanders should have been disclosed, this Court also concludes that suppression of the statement is not warranted, particularly where there is no evidence that the Government intentionally withheld disclosure of the statement and Harris has not shown any prejudice by the late disclosure.   Fed. R. Crim. P. 16(c) requires that "a party who discovers additional evidence or material before or during trial must promptly disclose its existence to the other party or the court."   The statement was discovered and disclosed at the same time

---

confronted with a situation where the <u>Mirandized</u> defendant, who had been arrested and seated in the back of a patrol car, interrupted a discussion between the police officers in the car regarding a missing shotgun and made an inculpatory statement.  Innis, 446 U.S. at 294-95.   In concluding that the defendant was not interrogated within the meaning of <u>Miranda</u>, the Supreme Court defined interrogation as follows:

> We conclude that the <u>Miranda</u> safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under <u>Miranda</u> refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the <u>police should know are reasonably likely to elicit an incriminating response from the suspect.</u>

446 U.S. at 301 (emphasis added).  By "incriminating response," the Court stated it was referring "to any response – whether inculpatory or exculpatory – that the prosecution may seek to introduce at trial." <u>Id.</u> at 302 n 5.

The Eighth Circuit has not spoken on the relationship between Fed. R. Crim. P. 16(a) and the application of the <u>Innis</u> definition of interrogation when a person is in custody.   However, even if this Court were to find, as have other courts, that the <u>Innis</u> definition of interrogation should apply to Harris' statement regarding Sanders rental of the car, the Court does not find that Officer Nelson should have known his questions to Harris about who had rented the car were likely to evoke an incriminating response by Harris.   Having learned that Harris did not possess a valid driver's license and was driving a rental car, Officer Nelson's questions regarding the identity of the renter were more in the form of routine background questions and do not constitute an interrogation. <u>See</u> <u>Berkemer v. McCarty</u>, 468 U.S. 420, 440 (1984) (roadside questioning during a routine traffic stop by police does not constitute a custodial interrogation requiring <u>Miranda</u> warnings); <u>United States v. Howard</u>, 532 F.3d 755, 761 (8th Cir. 2008) (same). These questions were not designed to elicit incriminating statements, and Officer Nelson would not have reasonably known that his questions would do so.

– when Officer Nelson testified to the statement at the suppression hearing. See United States v. Levine, 700 F.2d 1176, 1182 (8th Cir. 1983) (finding no abuse of discretion by the district court in refusing to exclude the statements where the prosecutor promptly informed defense when he learned of the evidence). Harris then had the opportunity to cross-examine Officer Nelson at the motions hearing and did so at length. As such, Harris had knowledge of the statement well in advance of trial, which has not yet been scheduled.

Finding no misconduct by the Government and that Harris was not prejudiced by the delayed disclosure of the statement, the Court recommends that it not be suppressed based on the Government's failure to disclose it before the suppression hearing.

## II.  HOWARD'S MOTIONS TO SUPPRESS

### A.  Facts

DEA Agent Terrance Glynn testified as follows: In approximately October of 2006, Agent Glynn began investigating Armando Sanders and the Hoodrich drug trafficking organization. Tr. 47, 53. Agent Glynn was using a reliable informant who had been providing him with information regarding the organization. Tr. 49:2-10. On December 26, 2007, surveillance was begun at a residence located at XXXX West 168th Place in Country Club Hills, Illinois, which the informant, as well as another DEA agent, had indicated was a stash house for Sanders' organization. Tr. 49. Sanders resided at this residence. Tr. 73. Several vehicles were observed at the residence, including a blue Mercury Mountaineer. This blue Mountaineer was stopped on December 26, 2007 after leaving the residence. Tr. 50. The driver of the vehicle was Sanders and the

passenger was defendant Delores Howard.  Tr. 50.  Sanders was married to Howard's sister.  Tr. 73.  Upon speaking with Sanders, the officer smelled a strong odor of burnt cannabis coming from inside the vehicle.  Tr. 51.  He asked Howard if she was in possession of marijuana, and she stated that she was and provided him with three small bags of marijuana.  Tr. 51.  Howard was placed under arrest.  Tr. 51.  The officer also learned that Sanders had a suspended license and an outstanding arrest warrant, and subsequently arrested Sanders.  Tr. 50.  The Mountaineer was ultimately impounded, and a certified canine was used to check the vehicle and alerted for the possible presence of narcotics in the car.  Tr. 51-52.  The vehicle was then searched, and officers discovered an electronically-operated, custom-concealed compartment under the third row seat that could be used to store large amounts of drugs and currency.  Tr. 52.  The next day, on December 27, 2007, investigators applied for and installed a tracking device into the blue Mountaineer.  Tr. 52.  On December 30, 2007 investigators learned that the blue Mountaineer was traveling from Minneapolis to Chicago, which was consistent with what investigators knew about the Hoodrich organization.  Tr. 53.  At the request of Agent Glynn, the Mountaineer was stopped.  Tr. 53.  Delbert Langston[10] was driving the car with a passenger named Derek Ross.  Tr. 53.  Langston was the registered owner of the blue Mountaineer and gave verbal and written consent for the vehicle to be searched.  Tr. 54  Currency in the amount of $212,215 was discovered in the hidden compartment and Langston and Ross were arrested.  Tr. 54. A drug dog gave a positive alert to the presence of narcotics on the money.  Tr. 54.

---

[10]    Langston is a co-defendant in this case.

Between December 30, 2007 and January 18, 2008, investigators conducted periodic surveillance of the residence in Country Club Hills.  Tr. 54.  They learned that Sanders, Lebyron Carr[11] and John Cooper frequented the residence, and again saw several different vehicles at the residence.  Tr. 55.  On January 18, 2008, Agent Glynn was conducting surveillance of the house, at which time he observed a 2005 Jeep Cherokee parked and backed up along the back door on the grassy area off the driveway.  Tr. 55.  The vehicle was parked in such a fashion that it was difficult for anyone to observe it from the street.  Tr. 56.  Agent Glynn saw that the back hatch of the vehicle was open, and there was an unknown black male wearing blue latex surgical gloves going in and out of the car, the passenger seat, the back, and then into the residence.  Tr. 56.

On the same day, Agent Glynn observed a gold Mercury Mountaineer parked in the driveway of the residence and a silver Dodge Magnum arrive and park in front of the house.  Tr. 56.  A black female, later identified as Candace Keough, went to the Magnum and then re-entered the house.  Tr. 56-57.  A short time later, a car seat was removed from the Magnum and another individual, Brandon Roy, took the seat to the Jeep which was still parked at the back of the residence and installed the seat in the back of the Jeep.  Tr.57.  Keough got into the driver's seat of the Jeep and Roy was in the passenger seat; they then switched so that Roy was driving and Keough was in the passenger seat, and there were two children in the back seat of the car.  Tr. 57.  Roy pulled the Jeep into the driveway and exited the vehicle, went into the residence for a short period of time, and came back out, at which point the vehicle left the residence.

---

[11]     Carr is a co-defendant in this case.

Tr. 57.   The Jeep was followed to a number of locations, and was eventually was stopped for a traffic violation around 2:00 p.m. on southbound Interstate 57 by a Cook County canine patrol officer.   Tr. 57-59.   At this time, the driver was Keough, and she was asked for her driver's license and insurance card, but she could not produce her insurance card.   Tr. 59.   The officer did a canine exterior search of the vehicle, and the dog gave a positive hit on the rear wheel well.   Tr. 59.   The vehicle was driven to the Cook County Police Department Lab and a further search of the interior of the vehicle was conducted, at which time 25 kilograms of cocaine were recovered from the rear back of the vehicle.   Tr. 59.   The Jeep contained an electronically controlled hidden compartment similar to the one found in the blue Mercury Mountaineer.   Tr. 59-60.

As for the gold Mercury Mountaineer, it left the residence before the Jeep, and investigators followed it to a gas station.   Tr.58.   The driver, Carr, exited the vehicle and went inside the gas station; he came back out and entered a newer model white Range Rover and sat in the back seat.   Tr. 58.   Carr got out of the Range Rover, got back into the gold Mountaineer, and then went northbound on the interstate toward Chicago.   Tr. 58.   Surveillance lost the Mountaineer for a short period of time, but it was re-established when the Mountaineer returned to the residence in Country Club Hills at approximately 3:17 p.m.   Tr. 58, 60.   The gold Mountaineer backed into the driveway, and Carr exited the vehicle and entered the residence through the south rear door.   Tr. 60.   A short time later, Carr was seen exiting the back door carrying something that appeared heavy, and then he walked to the rear passenger door of the gold Mountaineer and opened it and the rear hatch of the vehicle.   Tr. 61, 77.   Shortly

thereafter, a white Cadillac arrived and parked in front of the house, and three black women exited the vehicle with a child and entered the residence.  Tr. 61.

Shortly afterward, Howard was observed exiting the rear of the residence and walking over to the gold Mountaineer.  Tr. 61.  Howard got into the driver's seat of the gold Mountaineer.  Tr. 61.  Surveillance agents observed Carr on the telephone, looking up and down the street.  Tr. 61.  Howard then exited the driveway and made a series of turns which Agent Glynn described as counter-surveillance moves.  Tr. 61, 78.  She then drove at a high rate of speed on 167th Street, and approximately a mile later, made a sudden left-hand turn from the right lane, at which time the Cook County Sheriff conducted an investigative stop on the vehicle.  Tr. 62, 78  The officer determined that Howard had a suspended driver's license and she was arrested at that time.  Tr. 63.  The gold Mountaineer was transferred to the Cook County Police Lab.  T. 63.

Based on the fact that the gold Mountaineer had left the same residence as the Jeep that had been pulled over and found to contain 25 kilograms of cocaine, the knowledge that the vehicle contained a hidden compartment, the observation of Carr carrying something heavy to the Gold Mountaineer, and the counter-surveillance maneuvers by Howard, a canine sniff of the vehicle exterior was conducted, at which time the canine gave a positive alert on the rear bumper.  Tr. 63, 88-89.  The vehicle was then searched and was found to contain 24 kilograms of cocaine underneath the rear seat.  Tr. 63.

When asked to summarize his reasons for stopping the gold Mountaineer, Agent Glynn testified that there were several different bases: the recovery of 25 kilograms of cocaine from the hidden compartment of the Jeep after it left the Country Club Hills

residence; the gold Mountaineer left for a short period of time, and upon its return, Carr was observed carrying something heavy to the vehicle and going to the back of it where the side passenger door and back hatch were open; and Howard then drove the vehicle from the residence, conducting counter-surveillance measures.  Tr. 76-78.  Agent Glynn also knew that Howard had been stopped in a blue Mountaineer with Sanders in late December and had been arrested for possession of marijuana, that a trap had been found in that vehicle, that $212,000 was recovered from the trap three days later, and that the vehicle was the same make and model as the vehicle Howard was driving on January 18, 2008.  Tr. 84-85.

After she was arrested, Howard was held at the Cook County Sheriff's Police Department in Markham, Illinois.  Tr. 63.  She was advised of her <u>Miranda</u> rights, and indicated that she understood.  Tr. 64.  Howard was interviewed for about ten minutes and denied any knowledge of the cocaine in the car.  Tr. 64.  At no time did she ever ask for a lawyer or invoke her right to remain silent.  Tr. 65.  Howard did not sign a piece of paper waiving her <u>Miranda</u> rights, and the interview was not recorded.  Tr. 80.

On January 20, 2008, Agent Glynn's partner, Patrick Donovan, was contacted by the Cook County State's Attorney who related to him that Howard wanted to speak with the agents who arrested her.  Tr. 65.  Howard was interviewed in an interview room at the Cook County Jail by Agent Glynn, Patrick Donovan and Joseph Wesley.  Tr. 65, 67.  Agent Glynn advised her verbally of her <u>Miranda</u> rights, which she stated that she understood and waived.  Tr. 65-66.  Howard did not sign a paper waiving her rights, and the interview was not recorded.  Tr. 67.  The interview lasted for approximately one

hour, and took place in a room that was approximately 10 by 10 or 10 by 12 feet.  Tr. 83.  All of the interviewing officers were in plainclothes and unarmed.  Tr. 83.

At one point during the interview, Howard stated that the person the investigators were looking for was her brother-in-law, Armando Sanders, and that he lived in the Country Club Hills residence in the north bedroom.  Tr. 82.  She further stated that an individual named John Cooper lived in the south bedroom, and that Lebyron Carr lived in the upstairs bedroom; Carr had advised her to take the car to XXXX 142nd Street in Dolton, Illinois, which was an address where she used to live.  Tr. 82.  Howard stated that Carr had basically told her that the car was "locked and loaded," which she said was a term indicating that the vehicle contained narcotics or illegal drugs, in particular cocaine.  Tr. 82.

At no time during the second interview did Howard request to speak to an attorney or indicate that she no longer wished to answer questions.  Tr. 67.  There was no yelling or shouting and Howard appeared to understand the questions that were asked of her.  Tr. 68.  Howard never asked for a restroom break, for food or water or anything of the kind.  Tr. 68.  No promises were made to Howard during the interview.  Tr. 69.  After speaking to her for an hour, the interview was terminated.  Tr. 68.

**B.    Analysis**

**1.    Motion to Suppress Evidence**

Howard primarily challenges the stop of the gold Mountaineer.   Howard Memorandum in Support of the Defendant's Motion to Suppress Evidence Seized from a Motor Vehicle ("Howard Mem."), p. 1 [Docket No. 95].  Howard conceded that she did not have standing to contest the search of the residence in Country Club Hills, and that

if the stop of the gold Mountaineer was upheld, that her subsequent arrest and the search of the vehicle after the canine sniff were lawful. Id., pp. 1, 6. As such, the Court first addresses the legality of the stop of the Mountaineer.

Howard argued that the stop of the gold Mountaineer was not justified by reasonable suspicion because although police knew that other vehicles connected with the Country Club Hills address had secret compartments and had been found to contain drugs, no contraband was seen being placed in the gold Mountaineer driven by Howard. Howard Mem., p. 5. Further, Howard maintained that the police had no informant information regarding the contents of the Mountaineer, had performed no records check on Howard before the stop, and had no basis for making an investigatory stop on her. Id., p. 6. In opposition, the Government asserted that officers had a reasonable suspicion that the gold Mountaineer or its occupants were involved in criminal activity, and thus, were warranted in making an investigatory stop of the vehicle. See Gov't Mem., pp. 11-15.

"The Fourth Amendment permits an investigative stop of a vehicle if officers have a reasonable suspicion the vehicle or its occupants are involved in criminal activity." United States v. Bell, 480 F.3d 860, 863 (8th Cir. 2007). "While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." United States v. Fuse, 391 F.3d 924, 929 (8th Cir. 2004). A court must consider the totality of the circumstances when determining whether the particular facts known to the officer supplied an "objective and particularized basis for a reasonable suspicion of criminal activity." United States v. Maltais, 403 F.3d 550, 554 (8th Cir. 2005).

In this case, law enforcement had knowledge of the following information prior to the stop of the gold Mountaineer on January 18, 2008:  the Country Club Hills residence was a drug stash house for the Sanders drug trafficking organization; Sanders resided at the house and Sanders was married to Howard's sister; at the end of December 2007, Howard and Sanders had been stopped in a blue Mountaineer seen leaving the Country Club Hills residence, and the vehicle was found to contain a concealed custom trap designed to hold drugs and money; at the time of the stop, Howard was in possession of marijuana and was placed under arrest; and three days later the blue Mountaineer was stopped again, over $212,000 in currency was discovered in the hidden compartment of the vehicle and a canine dog alerted to the presence of narcotics on the money.  In addition, on January 18, 2008, the day of the stop of the gold Mountaineer, while conducting surveillance of the Country Club Hills residence, investigators observed several vehicles coming and going from the residence, including a Jeep Cherokee, a Dodge Magnum, the gold Mountaineer and a white Cadillac.  Prior to stopping Howard in the gold Mountaineer, investigators saw an individual wearing blue latex gloves getting in and out of the Jeep and going back into the residence.  This Jeep was subsequently stopped and found to contain twenty-five kilos of cocaine in a hidden compartment similar to the one found in the blue Mountaineer in December 2007.   Officers also observed the gold Mountaineer leave the Country Club Hills residence before the Jeep and then return, at which time the driver, Carr, backed the vehicle into the driveway and was observed to be carrying something heavy to the vehicle and open the rear passenger door and rear hatch.  Howard then got into the gold Mountaineer and before she left the residence, investigators saw Carr outside the

residence looking up and down the street and talking on a cell phone.   Finally, investigators observed Howard make a series of counter-surveillance moves and commit two traffic violations in their presence.

In summary, on January 18, 2008, the investigating officers were in possession of facts which tied drug trafficking activities to the Country Club Hills residence and the vehicles that came and left this residence.   With regard to Howard and the gold Mountaineer, they not only saw the SUV at the residence, but also observed actions at the vehicle by Carr and Howard consistent with these drug trafficking activities, including Carr carrying something heavy to the vehicle that had the rear passenger door and hatch door open, Carr looking up and down the street and talking on a cell phone before Howard pulled into traffic, and Howard engaging in counter-surveillance moves after she left the house.   Based on all of these facts and on the totality of these circumstances, the Court finds that the officers had a reasonable suspicion to believe that the gold Mountaineer contained evidence of criminal activity and they had an objective and particularized basis to stop the vehicle.   Howard's challenge to the lawfulness of her arrest and subsequent search of the vehicle on this basis should be denied. [12]

---

[12]      Agent Glynn did not testify and the Government did not argue that Howard was stopped for traffic violations.   However, as noted above, "a traffic violation – however minor – creates probable cause to stop the driver of a vehicle."  Linkous, 285 F.3d at 719; see also United States v. Olivera-Mendez, 484 F.3d 505, 509 (8th Cir. 2007) ("it is well-established that a police officer who observes a traffic violation has probable cause to stop the vehicle and its driver").   This is true even if a valid traffic stop is a pretext for another investigation.  Id.  (citation omitted).   Thus, even assuming that the real reason for the traffic stop was because the surveilling officers believed that the vehicle was carrying drugs, the actual motive in stopping the vehicle is irrelevant so long as the stop was valid.  See Whren v. United States, 517 U.S. 806, 810, 812-13 (1996).   Here, Agent Glynn testified that Howard was observed traveling at a high rate of speed, and making

### 2.     Motion to Suppress Statements

Howard filed a general motion to suppress statements [Docket No. 58].  In this motion, she stated that any statements were given in violation of her Fourth and Fifth Amendment rights, and were not knowingly and voluntarily given.  Id., p. 1.  At the hearing, she confirmed that she was proceeding with that motion, and suggested that the statements from the interviews on January 18 and 20 required suppression based on a Miranda violation.  Tr. 21, 87.  In her post-hearing memorandum, Howard did not mention this motion at all, suggesting that she had conceded the motion.  In an abundance of caution, the Court will briefly address the motion.

Miranda v. Arizona requires that an individual be advised of his right to be free from compulsory self-incrimination and the right to the assistance of an attorney anytime the individual is taken into custody for questioning.  Miranda v. Arizona, 384 U.S. 436, 444 (1966); see also United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990).  Therefore, the protections afforded by Miranda are triggered when an individual "is both in custody and being interrogated."  United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995) (citing United States v. Lawrence, 952 F.2d 1034, 1036 (8th Cir. 1992)).

There is no dispute that Howard was in custody at the time the statements were made, and that she was therefore entitled to a reading of her Miranda rights.  Further, it is evident from the record that she was given her Miranda rights.  Tr. 64-66.  Thus, the only issue that remains for determination is whether Howard validly waived those rights.

A waiver of Miranda rights is valid if it satisfies the following criteria:  "First, the relinquishment of the right must have been voluntary in the sense that it was the product

---

a left-hand turn from the right-hand lane.  Tr. 62, 78.  These violations alone provided the officers with probable cause to stop the vehicle.

of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (citing United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994)). "The determination of whether an accused has knowingly and voluntarily waived his Miranda rights depends on all the facts of each particular case." Stumes v. Solem, 752 F.2d 317, 320 (8th Cir. 1985) (citing Fare v. Michael C., 442 U.S. 707, 724-25 (1979)). Only if the "'totality of the circumstances surrounding the interrogation'" reveals both an uncoerced choice and the requisite level of comprehension may this Court properly conclude that the defendant's Miranda rights have been waived. See Moran v. Burbine, 475 U.S. 412, 421 (1986) (quoting Fare, 442 U.S. at 725).

Here, there are no facts to indicate that Howard's waiver was not the product of free choice, and Howard has offered nothing to suggest that her Miranda rights were waived involuntarily, or that she was coerced into the waiver. The interview on January 18 was brief, lasting ten minutes, and there is no testimony regarding any circumstances of that interview, except that she never asked for a lawyer or invoked her right to remain silent. Tr. 65. The interview on January 20 was initiated by Howard, not by investigators, indicating that her participation in that interview was voluntary. Howard was interviewed for approximately one hour in an interview room at the Cook County Jail by three officers. Tr. 65-67. The interviewing officers were in plainclothes and unarmed. Tr. 83. At no time did Howard request to speak to an attorney or indicate that she no longer wished to answer questions. Tr. 67. There was no yelling or shouting

and Howard appeared to understand the questions that were asked of her. Tr. 68. Howard never asked for a restroom break, for food, water or for anything else, and no promises were made to Howard during the interview. Tr. 68-69.

In short, there is nothing in the record to support an inference of either a <u>Miranda</u> violation or an involuntary statement. As such, the Court recommends that Howard's Motion to Suppress Statements be denied.

## II. RECOMMENDATION

For the reasons set forth above and based on all the files, records, and proceedings herein,

**IT IS RECOMMENDED THAT:**

1. Defendant Keenan Harris's oral motion to suppress a traffic stop and citation from June 28, 2006 be DENIED;

2. Defendant Delores Howard's Motion to Suppress Evidence Obtained as a Result of Search and Seizure of Defendant's Residence and Vehicle [Docket No. 56] be DENIED;

3. Defendant Delores Howard's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 57] be DENIED; and

4. Defendant Delores Howard's Motion to Suppress Statements, Admissions and Answers [Docket No. 58] be DENIED.

Dated:        February 5, 2009


                         *s/ Janie S. Mayeron*
                         JANIE S. MAYERON
                         United States Magistrate Judge



Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before **February 23, 2009** a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.